1 | Alan D. Croll (State Bar No. 35895)
alan.croll@kattenlaw.com
2 | Ryan J. Larsen (State Bar No. 211622)
ryan.larsen@kattenlaw.com
3 | **KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East, Suite 2600
4 | Los Angeles, CA 90067-3012
Telephone: 310.788.4400
5 | Facsimile: 310.788.4471

6 | Ori Katz (State Bar No. 209561)
OKatz@SheppardMullin.com
7 | J. Barrett Marrum (State Bar No. 228628)
BMarrum@SheppardMullin.com
8 | **SHEPPARD MULLIN RICHTER & HAMPTON LLP**
501 West Broadway, 19th Floor
9 | San Diego, CA 92101-3598
619.338.6500 | main

10 |

11 | Attorneys for Sandra Kessler, PrimeTel
Communications, Inc., Unilink Telcom, Inc., WireStar
12 | Communications, Inc., Mayfair Communications, Inc.,
USA Broadband, Inc. and Yorkshire TeleCom, Inc.

13 |

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re | Bankruptcy No. 13-12171-LA11 |
| | |
| TELESERVICES INC., | **OPPOSITION OF SANDRA KESSLER, PRIMETEL COMMUNICATIONS, INC., UNILINK TELECOM, WIRESTAR COMMUNICATIONS, MAYFAIR COMMUNICATIONS, USA BROADBAND, INC. AND YORKSHIRE TELECOM, INC. TO DEBTOR'S EMERGENCY MOTION** |
| Debtor and Debtor-in-possession | |
| | |
| | [Request for Judicial Notice; Declarations of Sandra Kessler, David Cadoff, Edward Dye, David Solomon, and Ryan J. Larsen; Evidentiary Objections submitted herewith] |
| | |
| | Date: January 7, 2014 |
| | Time: 2:00 PM |
| | Judge: Hon. Louise DeCarl Adler |
| | Dept.: 2 |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION
100151803v6

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................1

II.    STATEMENT OF FACTS ................................................................3

    A.    The Parties. ................................................................3

    B.    The Business Arrangement Between USA Broadband and DigitalMojo. ..............................3

    C.    DigitalMojo Breached The Agreement. ................................................................6

    D.    USA Broadband Terminated The Agreement For Non-Payment. ..............................7

    E.    TeleServices Improperly Sought To Assert Control Over The TFNs. ..............................8

III.    THE PENDING STATE COURT LITIGATION ................................................................10

    A.    Plaintiffs Filed A Complaint And Obtained A Temporary Restraining Order On An Ex Parte Motion. ................................................................10

    B.    Upon Full Consideration Of The Applicable Facts And Law, The State Court Denied The Application For A Preliminary Injunction And Dissolved The Temporary Restraining Order. ................................................................11

    C.    USA Broadband Directed Calls From The TFNs Away From DigitalMojo's Call Centers. ................................................................12

    D.    TeleServices Filed The Bankruptcy Petition And Then Filed The Emergency Motion. ................................................................12

    E.    There Are Serious Questions As To Whether This Chapter 11 Case Is Proper. ..............13

IV.    ARGUMENT ................................................................13

    A.    TeleServices Has No "Property" Right To Calls From The TFNs. ..............................13

    B.    TeleServices Has No Contractual Right To Calls From The TFNs. ..............................18

    C.    The Motion Should Be Also Denied Because It Is Procedurally Improper As The Relief Requested Must Be Sought In An Adversary Proceeding. ..............................23

V.    CONCLUSION ................................................................25

i

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION

100151803v6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Administration of the North American Numbering Plan, Report and Order,
  11 FCC Rcd 2588 (1995)..................................................................................... 14

Aspex Eyewear, Inc. v. Vision Serv. Plan
  (9th Cir. 2010) 389 Fed.Appx. 664 ..................................................................... 21

Consolidated World Investments, Inc. v. Lido Preferred Ltd.,
  9 Cal. App. 4th 373 (1992).................................................................................. 22

Digital Communs. Network, Inc. v. AT&T Wireless Servs.,
  63 F. Supp. 2d 1194 (C.D. Cal. 1999)................................................................ 15

Edge Grp., Inc. v. Champion Mortgage Co., Inc.,
  519 F. 3d 150 (3rd Cir. 2008)............................................................................. 14

In re Best re Manufacturing Co.,
  453 F. 2d 848 (9th Cir. 1971).............................................................................. 13

In re Brawders,
  503 F. 3d 856 (9th Cir. 2007).............................................................................. 23

In re Commercial Western Finance Corp.,
  761 F. 2d 1329 (9th Cir. 1985)............................................................................ 23

In re Edwin M. Lipscomb Farms, Inc. v. Michigan Millers Mutual Ins. Co.,
  90 B.R. 422 (W.D. Missouri) (1988)................................................................. 19

In re Heaven Sent Ltd. v. Commercial Union Ins. Co.,
  37 B.R. 597 (E.D. Penn.) (1984) .................................................................. 19, 20

In re Hospitality Associates, Inc.,
  6 B.R. 778 (D. Oregon 1980) ............................................................................. 20

In re Jahr,
  No. 11-02302, 2012 WL 3205417 (B.A.P. 9th Cir. 2012) ................................. 23

In re Lauderdale Motorcar Corp.,
  35 B.R. 544 (S.D. Fla. 1983)............................................................................... 20

In re Mansaray-Ruffin,
  530 F. 3d 230 (3rd Cir. 2008)............................................................................. 23

ii

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION

100151803v6

In re Semcrude, L.P.,
  728 F. 3d 314 (3rd Cir. 2013)................................................................................................. 23

In re StarNet. Inc.,
  355 F. 3d 634 (7th Cir. 2004)............................................................................................... 14

In re Transaction Network Services, Inc., TSYS Acquiring Solutions, LLC, & Electronic Payment
  Systems, LLC,
  (WCB 2011) 26 F.C.C.R. 2109 ............................................................................................. 15

Lortz v. Connell,
  273 Cal. App. 2d 286 (1969) ................................................................................................ 20

Moody v. Amoco Oil Co., 734 F. 2d 1200 (7th Cir. 1984) ........................................... 19, 20

Silver v. Bank of America, N.T. & S.A.,
  47 Cal. App. 2d 639 (1941) .................................................................................................. 22

Slenderella Sys. of Berkeley, Inc. v. Pac. Tel. & Tel. Co.,
  286 F. 2d 488 (2nd Cir. 1961) ............................................................................................. 14

Toll Free Service Access Codes, Fourth Report and Order and Memorandum Opinion and Order,
  13 FCC Rcd 9058 (1998)....................................................................................................... 14

Toll Free Service Access Codes, Notice of Proposed Rulemaking,
  10 FCC Rcd 13692 (1995)...................................................................................................... 14

Toll Free Service Access Codes; Database Services Management, Inc. Petition for Declaratory Ruling,
  15 FC.C.R. 11939 (2000) ....................................................................................................... 18

Transaction Network Services, Inc., TSYS Acquiring Solutions, LLS, & Electronic Payment Systems,
  LLC,
  26 FCC Rcd 2109 (Wireline Comp. Bur. 2011)................................................................... 14

U.S. Department of Health and Human Services Substance Abuse and Mental Health Services
  Administration Petition for Permanent Reassignment of Three Toll Free Suicide Prevention Hotline
  Numbers/Toll Free Service Access Codes,
  27 FCC Rcd 2965 ¶ 5 (Wireline Comp. Bur. 2012) ........................................................... 14

White Motor Corp. v. Nashville White Truck, Inc.,
  5 B.R. 112 (M.D. Tenn.1980)................................................................................................ 20

Zee Medical Distrib. Ass'n v. Zee Medical,
  80 Cal. App. 4th 1, (2000) .................................................................................................... 21

Zimco Rests., Inc. v. Bartenders & Culinary Workers Union, Local 340,
  165 Cal. App. 2d 235 (1958) ................................................................................................ 21

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
EMERGENCY MOTION

100151803v6

**Statutes**

47 CFR § 52.101(b) ............................................................................... 3, 18

47 CFR § 52.101(e) ................................................................................... 17

47 CFR § 52.105 ....................................................................................... 17

47 U.S.C. § 251(e)(1) ........................................................................... 14, 15

Cal. Civ. Code § 1624(a)(1) ...................................................................... 22

Cal. Civ. Code § 654 ................................................................................... 1

**Rules**

Bankr. S.D. Cal. R. 9014-5(f) .................................................................... 24

Fed. R. Bankr. P. 7001 ............................................................................... 23

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION

100151803v6

1    Sandra Kessler, PrimeTel Communications, Inc., Unilink Telcom, Inc., WireStar

2  Communications, Inc., Mayfair Communications, Inc., USA Broadband, Inc. and Yorkshire TeleCom,

3  Inc. (collectively "Kessler Affiliates") hereby oppose debtor TeleServices, Inc.'s ( "Debtor" or

4  "TeleServices") Emergency Motion for violation of the automatic stay as follows:

5              **I.      PRELIMINARY STATEMENT**

6          Because the Debtor's Emergency Motion ("Motion") is voluminous and complex, in this

7  preliminary statement the Kessler Affiliates will summarize the arguments and provide an overview of

8  the deficiencies in the Debtor's position.  The bottom line is that the sole purpose for this Chapter 11

9  proceeding and Motion is to attempt to fight a battle in this Court that the Debtor already lost across the

10  street in state court, the forum the debtor chose pre-petition by suing the Kessler Affiliates and seeking

11  and failing to obtain injunctive relief therein.

12          The Motion can be boiled down into the following two arguments:  (1) the toll-free numbers at

13  issue are the "property" of the Debtor; or alternatively, (2) the Debtor has the contractual right to use

14  and possess the toll-free numbers.  Both fail on the facts and the law.

15          The Debtor's first argument fails because it is well established in the Ninth Circuit and otherwise

16  that no party "owns" or has a property interest in any toll-free number.  While Section 541 of the

17  Bankruptcy Code is broad, it certainly does not create property rights for a debtor where none exist

18  under the applicable, substantive non-bankruptcy law.  Here, the Debtor's reliance on the statutory

19  language of Section 654 of the California Civil Code (describing "property" in a general sense) must

20  give way to the federal statutes and published FCC decisions directly on point that state that no party

21  "owns" telephone numbers.

22          The FCC has exclusive jurisdiction to resolve any disputes over telephone numbers, and  the

23  debtor's own witness, Douglas Orvis, concedes as much in his declaration.  Even if this Court had

24  jurisdiction to make a finding that the Debtor is the toll-free subscriber for the subject numbers, which it

25  does not, the facts and law are clear that USA Broadband, not TeleServices, is the toll-free subscriber for

26  the subject toll-free numbers. The Debtor ignores all of the relevant evidence, and instead relies solely

27

                                                      1

28  MEMORANDUM  OF  POINTS  AND  AUTHORITIES  IN  OPPOSITION  TO  DEBTOR'S
EMERGENCY MOTION
100151803v6

on the testimony of Mr. Orvis, who is counsel for an affiliate of the Debtor.  The testimony is an unsupported legal conclusion and inadmissible.  Moreover, it does not address any of the relevant legal factors and is directly contradicted by emails authored by the Debtor's CEO Mr. Smith, wherein he told third parties that his companies did not own or control the numbers.

Debtor's second argument is identical to what was briefed, argued and soundly rejected by Judge Lewis in the state court action.  Simply put, the Debtor is seeking to reinstate a temporary restraining order that the issuing court has already dissolved, prior to the bankruptcy filing.  It is well-settled that it is not the purpose of the bankruptcy court to act as an appellate court for parties who are unhappy with the results obtained in another forum.  Nor is the bankruptcy court the appropriate forum to provide disgruntled litigants with another "bite at the apple."  Whether the Debtor's actions are labeled forum shopping, taking another shot, or something else altogether, it is clear that bankruptcy courts frown on such conduct.

Finally, the Court must understand that what the Debtor requests in its Motion goes far beyond enforcing compliance with the automatic stay or preserving some version of the status quo ante.  USA Broadband terminated the oral agreement with the Debtor in early October 2013.  The issuance of the TRO briefly breathed life back into the agreement, but the agreement died immediately upon the dissolution of the TRO, prior to the bankruptcy filing.  The Debtor's Motion requests that the Court revive the fiction created by the TRO, *a fiction that did not exist when the Debtor filed its bankruptcy petition*.

Perhaps more importantly, the Motion requests affirmative relief – the transfer of the toll-free numbers to a new Responsible Organization.  Throughout the parties' seven-year business relationship, Responsible Organizations owned by Kessler have *always* administered the numbers at issue.  Transferring the numbers to a new responsible organization would dramatically alter the parties' respective positions.

The Motion falls well short of the burden needed to grant the extraordinary relief the Debtor seeks.  The Court should deny it for all of the reasons summarized above and discussed more fully below.

2

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION

100151803v6

## II.    STATEMENT OF FACTS

### A.    The Parties.

PrimeTel Communications, Inc., Unilink Telcom Inc., WireStar Communications, Inc., Mayfair Communications, Inc. and Yorkshire TeleCom, Inc. are "Responsible Organizations," or "RespOrgs," for TFNs under the FCC's rules and regulations.  (Declaration of Sandra Kessler, ¶ 2.) ("Kessler Decl."). RespOrgs are the entities that reserve TFNs out of the centralized database of TFNs (the "SMS/800 database") on behalf of subscribers.  47 CFR § 52.101(b) (defining RespOrg as the "entity chosen by a toll free subscriber to manage and administer the appropriate records in the toll free Service Management System for the toll free subscriber").  These entities served as the RespOrgs for the TFNs at issue in this case.

USA Broadband has been involved in a number of business pursuits that caused it to become the toll-free subscriber of a large number of TFNs.  Toll-free subscribers of TFNs must pay certain charges ("RespOrg fees") to the RespOrg that reserves, manages and administers those TFNs in the SMS/800 database.  USA Broadband consistently has paid RespOrg charges to the RespOrgs that reserved, managed and administrated the TFNs to which USA Broadband is the toll-free subscriber.  Neither TeleServices, nor any of the other state court plaintiffs, paid any RespOrg charges related to these TFNs. (Kessler Decl., ¶ 3); (Declaration of Edward Dye, ¶ 4) ("Dye Decl.").

Sandra Kessler, is a shareholder and officer of Defendant USA Broadband and the RespOrg entities.  (Kessler Decl., ¶¶ 2-3).

### B.    The Business Arrangement Between USA Broadband and DigitalMojo.

The business relationship between the parties is set forth below.  To summarize in the very briefest terms:

1.    In 2006, the parties orally agreed that USA Broadband would direct calls from certain TFNs to which it was a toll-free subscriber to DigitalMojo's call centers.

2.    DigitalMojo answered the calls, and if the callers were looking to purchase products or services from the cable, satellite, or internet vendors with whom DigitalMojo had a relationship, DigitalMojo would attempt to sell them products or services.

3

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION
100151803v6

3.    DigitalMojo received a commission from the service providers for each sale, and agreed to pay USA Broadband 95% of its commissions after deducting for expenses.

4.    The parties agreed that the contract was terminable at will by either party at any time.

5.    DigitalMojo stopped paying USA Broadband the commissions that it was due. Accordingly, in October 2013, USA Broadband terminated the agreement and stopped routing calls from its TFNs to DigitalMojo's call centers.

The facts are as follows:  In July 2006, Martin Smith called Ms. Kessler and explained that his company GoBroadband, Inc. ("GoBroadband") recently had become a contracted independent sales agent for a large cable provider and asked Ms. Kessler if USA Broadband could send cable sales leads to GoBroadband.  Ms. Kessler had noticed that some of the TFNs for which USA Broadband was the toll-free subscriber received calls from consumers seeking to purchase cable service, which appeared to be because some of the toll-free numbers happened to have numbers corresponding to letters that "spelled out" words related to the cable industry.  Mr. Smith proposed entering into an arrangement whereby USA Broadband would re-direct calls coming into some of these TFNs from USA Broadband's current uses to GoBroadband's call centers to see how many cable sales could be generated.  (Kessler Decl., ¶ 4.)[1]  Mr. Smith stated that this call traffic could help GoBroadband achieve a higher sales volume tier resulting in a higher commission it would be paid per sale, and offered to pay USA Broadband a commission of 95% of the net revenue GoBroadband made on any sales of services or products that originated through leads from TFNs that USA Broadband directed to the call center, minus the telephone carrier charges and specific call center expenses relating to handling the calls and sales.  (Kessler Decl., ¶ 5.)[2]

---

[1]    Mr. Smith's contention in his state court declaration that in 2006 that the parties entered into a contract to direct calls from 17,000 TFNs is completely untrue. (RJN, Exh. 4, ¶ 5). In fact, in 2006, USA Broadband was directing calls from only 10 TFNs to GoBroadband.  In 2007, USA Broadband was directing calls from 2,774 TFNs, and in later years, calls from other TFNs were directed to Plaintiffs' call centers. (Kessler Decl., ¶ 6).  Mr. Smith now concedes that the contract concerns "what is now" approximately 17,000 numbers. (Smith Decl., ¶ 5).

[2]    USA Broadband was financially responsible for the telephone carrier charges for transporting the calls from USA Broadband's toll-free numbers to GoBroadband's call centers.  GoBroadband advanced those charges to the telephone carriers, but they were deducted from the commissions paid to USA

4

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION
100151803v6

1    Mr. Smith and Ms. Kessler thereafter entered into an oral agreement that USA Broadband would

2  direct calls generated by certain TFNs that might be helpful to GoBroadband's sales agency business to

3  GoBroadband's call centers. (Kessler Decl., ¶ 6). Throughout the relationship, Mr. Smith continually

4  acknowledged that USA Broadband was the toll-free subscriber for the TFNs. (Kessler Decl., ¶ 7). At

5  some point, Mr. Smith informed Ms. Kessler that GoBroadband's name had been changed to

6  DigitalMojo. Mr. Smith and Ms. Kessler never discussed or agreed to any contract between USA

7  Broadband and TeleServices. (Kessler Decl., ¶ 8).

8    Mr. Smith and Ms. Kessler agreed that the arrangement between DigitalMojo and USA

9  Broadband was terminable by either party at any time for any reason. Numerous times in the past

10 months and last few years, Mr. Smith told Ms. Kessler that DigitalMojo's business was not going well

11 and that he was going to need to "wind things down" and "shut down the business." Ms. Kessler

12 acknowledged that DigitalMojo could have USA Broadband stop directing calls to DigitalMojo's call

13 center. Similarly, the parties had numerous conversations over the years where Mr. Smith

14 acknowledged that USA Broadband could terminate the arrangement any time. (Kessler Decl., ¶ 9).

15    The group of USA Broadband's TFNs from which calls were directed to DigitalMojo's call

16 centers was not static. While over the course of the relationship USA Broadband may have directed

17 calls at one time or another from as many as 17,000 TFNs, on October 6, 2013 (when USA Broadband

18 terminated the contract), USA Broadband was directing calls from only 13,210 TFNs. USA Broadband

19 worked continually during the agreement to ensure that it directed call traffic to DigitalMojo that was

20 likely to produce the best sales leads for DigitalMojo's business. USA Broadband maintained complete

21 control and was the toll-free subscriber for all of the TFNs from which it directed calls to DigitalMojo's

22 call centers. (Kessler Decl., ¶ 10).[3] DigitalMojo's former COO, David Cadoff, has confirmed that USA

23 Broadband – i.e., GoBroadband effectively advanced those payments on behalf of USA Broadband.
   (Kessler Decl., ¶ 8). Again, this was confirmed by DigitalMojo's COO. (Cadoff Decl., ¶ 8).

24

25 [3]    Because the list of TFNs changed over time, there are several thousand TFNs for which USA
   Broadband had ceased directing calls to DigitalMojo. In each of these cases, USA Broadband resumed
   using the numbers for its other business endeavors. Accordingly, the list attached to the Emergency
26 Motion is incorrect, as it contains thousands of TFNs whose calls were not being directed to
27 DigitalMojo when the contract was terminated on October 6, 2013. (Kessler Decl., ¶ 12, Exh. "A").

5

28 MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
   EMERGENCY MOTION
   100151803v6

1  Broadband was always the toll-free subscriber for the TFNs and that this was continuously

2  acknowledged between the parties.  (Cadoff Decl., ¶¶ 4-5).

3        Mr. Smith's new contentions that "[t]he agreement provided that Kessler act as a broker or agent

4  and arrange for the routing of toll-free numbers to call centers of the Debtor" and "[n]othing in the

5  Contract or any later arrangements granted Kessler any right in the Telephone Numbers - she simply

6  acted as an agent for the Debtor and its related entities in securing the exclusive use of the Telephone

7  Numbers" (Smith Decl., ¶ 5) had not been previously offered in the initial state court Complaint, the

8  First Amended Complaint, or either of the two declarations he submitted in support of the application

9  for a preliminary injunction.  They are also completely untrue.  Mr. Smith and Ms. Kessler never agreed

10  that USA Broadband would act as an "agent" or "broker" on behalf of DigitalMojo.  As set forth above,

11  USA Broadband always retained complete control over the TFNs and had complete control over which

12  calls were directed to DigitalMojo's call centers.  (Kessler Decl., ¶ 12).

13        Mr. Smith's later contention that "[n]othing in the Contract or any later arrangements granted

14  Kessler any right in the Telephone Numbers" is correct, because USA Broadband was always the toll-

15  free subscriber for the TFNs - - before, during, and after the agreement with DigitalMojo.  No contract

16  with DigitalMojo was needed to grant USA Broadband that status.   (Kessler Decl., ¶ 12).

17        Mr. Smith's contention in paragraph 6 of his declaration that "During the course of the Contract,

18  Debtor and its related entities directed Kessler to reserve toll-free numbers for Debtor" is also not true.

19  Neither Mr. Smith nor any of his companies ever directed USA Broadband to reserve certain TFNs.  To

20  the contrary, since USA Broadband was the toll-free subscriber for the TFNs, it knew which TFNs

21  generated certain calls that may have been beneficial to DigitalMojo's business.  USA Broadband

22  therefore suggested that calls from certain TFNs should be directed to DigitalMojo's call centers; not the

23  other way around.  In fact, over 9,000 of the subject TFNs were reserved from the SMS/800 spare pool

24  by the defendant RespOrgs and were in use well prior to the arrangement with Mr. Smith that began in

25  2006.  (Kessler Decl., ¶ 13).  This is completely inconsistent with a supposed "agency" relationship.

26     **C.     DigitalMojo Breached The Agreement.**

27        DigitalMojo subsequently fell behind in its obligation to pay USA Broadband.  Several times,

6

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
EMERGENCY MOTION

100151803v6

1   Mr. Smith told Ms. Kessler that DigitalMojo's business was not going well or that he had personal

2   financial needs that prevented DigitalMojo from paying the full commissions it owed USA Broadband.

3   Starting in approximately August 2012, Ms. Kessler observed that the payments USA Broadband

4   received from DigitalMojo often were in "round numbers" that were relatively consistent from month to

5   month, and did not change in spite of improvement in the quality of calls directed to DigitalMojo,

6   making it obvious that DigitalMojo was not paying a commission of 95% on its actual net income, as it

7   was obligated to do. (Kessler Decl., ¶ 14). DigitalMojo also owed back payments for the previous two

8   years.

9       USA Broadband estimates that DigitalMojo currently owes approximately $2,000,000. (Kessler

10  Decl., ¶ 15). DigitalMojo's former COO Mr. Cadoff has confirmed that Mr. Smith told him that

11  DigitalMojo was not paying USA Broadband the full amount of commissions, and in addition, owed

12  USA Broadband past due commissions in the amount of over $750,000. (Cadoff Decl., ¶ 11).

13  **D.    USA Broadband Terminated The Agreement For Non-Payment.**

14      Ms. Kessler tried unsuccessfully for over a year to get DigitalMojo to pay the amounts it owed,

15  and repeatedly reiterated to Mr. Smith that if the situation were not resolved, USA Broadband would

16  stop directing traffic from its TFNs to DigitalMojo. By September 2013, Ms. Kessler was exasperated

17  and her trust in Mr. Smith was depleted. In an effort to make the best of a bad situation and mitigate her

18  losses, she made an offer to purchase DigitalMojo. The price she offered took into account the amount

19  of money that DigitalMojo owed USA Broadband. Mr. Smith directed Ms. Kessler to speak to his CPA

20  and his attorney, and after further negotiations, on October 11, 2013, the parties ultimately agreed upon

21  a price. (Kessler Decl., ¶¶ 16-17, Exh. "B"); (Cadoff Decl., ¶ 12).

22      Mr. Smith thereafter changed his mind and demanded a much higher purchase price, as well as

23  several other terms to which parties had not agreed. Mr. Smith also informed Ms. Kessler that

24  DigitalMojo would not pay USA Broadband commissions due on the money that it would be receiving

25  on sales closed in the previous months. As Ms. Kessler had been unable to get DigitalMojo to pay what

26  was due, and had been unable to get DigitalMojo to agree to any resolution, she decided USA

27  Broadband could not do business with DigitalMojo any longer. There was nothing "abrupt" about this

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
    EMERGENCY MOTION

7

1   decision - - it was only after months of fruitless discussions, numerous warnings, and unsuccessful

2   efforts to collect what was due that Ms. Kessler finally told Mr. Smith that USA Broadband would stop

3   directing calls to DigitalMojo.  (Kessler Decl., ¶ 18).

4             **E.      TeleServices Improperly Sought To Assert Control Over The TFNs.**

5             In response to USA Broadband terminating the contract, Mr. Smith repeatedly threatened Ms.

6   Kessler that he would harass any party to which USA Broadband directed calls from TFNs that formerly

7   had been used in the parties' sales lead generation arrangement.  Soon after USA Broadband stopped

8   directing calls from the TFNs to DigitalMojo, Mr. Smith told Ms. Kessler that things are going to "get

9   ugly", that he would "do whatever he had to do to put USA Broadband out of business", and would

10  "turn [her] life into a living hell."  (Kessler Decl., ¶ 19).

11            On October 30, 2013, TeleServices then tried to "steal" 1,015 of USA Broadband's TFNs from

12  which the highest volume and most productive calls were generated by unilaterally moving them away

13  from the Defendant RespOrgs to a RespOrg of its choosing.  As USA Broadband was the toll-free

14  subscriber to the TFNs, the Defendant RespOrgs promptly and lawfully took appropriate action to move

15  them back to USA Broadband.  (Dye Decl., ¶¶ 2-5).  On October 31, 2013, Ms. Kessler was informed

16  that Mr. Smith had taken this action and immediately called him.  Mr. Smith yelled "I told you things

17  were going to get ugly" and that he would do whatever he had to do and pay whoever he had to pay.  He

18  repeated his threats that he would interfere and harass any party to which USA Broadband directed calls.

19  (Kessler, Decl., ¶ 20).

20            Both Mr. Smith and Mr. Cadoff always knew that TeleServices was never the toll-free subscriber

21  for the TFNs.  Accordingly, Mr. Cadoff knew this plan to move the numbers was fraudulent and refused

22  to go along with it.  (Cadoff Decl., ¶¶ 13-14).  In addition to the clear understanding between the parties,

23  Mr. Smith also had previously told third parties that he did not "own" or control the TFNs.  As one

24  example, one of the TFNs that Mr. Smith attempted to move was 1-800-438-3474, which numbers can

25  correspond to the letters spelling 1-800-GETDISH.  In 2010, representatives of Dish Network contacted

26  Mr. Smith wanting to know how DigitalMojo was receiving calls from this number.  Mr. Smith

27  responded in a series of emails stating "we don't control the number and "we don't own that phone

                                                      8

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
    EMERGENCY MOTION
    100151803v6

1   number." He confirmed that "USA Broadband generates calls" from the number, and "calls on this

2   number are blended with other calls that [USA Broadband] sends to our call center." (Cadoff Decl., ¶ 9,

3   Exhs. "A-B") (emphasis added).

4          Mr. Smith had also told the same thing to other third parties.  In 2012, he and Mr. Cadoff met

5   with a company named All Connect concerning the potential sale of DigitalMojo to All Connect.  At the

6   meeting, the representatives from All Connect asked Mr. Smith how DigitalMojo was receiving calls

7   from the TFNs.  Mr. Smith stated that DigitalMojo did not own the TFNs; and that the company that did

8   directed the calls to DigitalMojo's call centers.  The representatives from All Connect asked whether

9   this arrangement was documented in a written contract, to which Mr. Smith replied that it was a

10  "handshake agreement."  All Connect ultimately declined to purchase DigitalMojo.  (Cadoff Decl., ¶

11  10).

12         Yet in October 2013, Mr. Smith represented the exact opposite by submitting forms to a

13  RespOrg stating that TeleServices was the toll-free subscriber of the TFNs, which by his own words was

14  a blatant lie.  Mr. Smith later offered Mr. Cadoff a severance payment on the condition that he sign a

15  "confidentiality" agreement, and threatened to "bankrupt" him if he disclosed any information about

16  DigitalMojo's business.  (Cadoff Decl., ¶ 15).

17         Mr. Smith's threats compromised USA Broadband's ability to use these TFNs in an optimal way

18  in lead generation.  USA Broadband nonetheless began using these TFNs for other purposes where USA

19  Broadband felt it could attempt to manage the impact of any harassment from Mr. Smith.  (Kessler

20  Decl., ¶ 21).

21         If the Court were to order the relief sought in the Emergency Motion, USA Broadband would be

22  unable to use the TFNs for other business purposes.  USA Broadband estimate that its use of TFNs for

23  other purposes would be generating profits of over $200,000 per month.  (Kessler Decl., ¶ 22).  Most

24  importantly, if the Court were to order that USA Broadband transfer the TFNs to a RespOrg of

25  TeleServices' choosing, this would be tantamount to a ruling on the merits that TeleServices is the

26  actual toll-free subscriber for these TFNs, which is completely untrue.  The cost to "NASC" the numbers

27  from USA Broadband's RespOrgs to TeleServices' RespOrg would be $338,440 as TeleServices states

9

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
    EMERGENCY MOTION
    100151803v6

1  in the Motion, and TeleServices improperly demands that USA Broadband pay this amount out of

2  pocket. Even more importantly, if the TFNs were actually moved, this may make it incredibly difficult

3  for USA Broadband to ever move the TFNs back to its own RespOrgs. If USA Broadband were unable

4  to do so, it would lose millions of dollars in future revenue that could be generated from calls to the

5  TFNs. (Kessler Decl., ¶ 23).

### III.    THE PENDING STATE COURT LITIGATION

### A.    Plaintiffs Filed A Complaint And Obtained A Temporary Restraining Order On An Ex Parte Motion.

9  On November 15, 2013, Plaintiffs filed a complaint in the San Diego Superior Court. The

10  Complaint asserted causes of action for 1) Breach of Contract, 2) Breach of the Implied Covenant of

11  Good Faith and Fair Dealing, 3) Alter Ego, 4) Equitable Estoppel, 5) Conversion[4], and 6) Injunctive

12  Relief. Plaintiffs alleged that "In or about early 2006, Kessler entered into a verbal contract with Martin

13  Smith ("Smith"), present and CEO of Plaintiffs, wherein she promised to route the [phone numbers] to

14  Plaintiffs' call centers." (Complaint, ¶ 20). The Complaint stated nothing about the purported duration

15  of the contract or how it could be terminated.

16  Plaintiffs immediately filed an Ex Parte Application For Temporary Restraining Order.

17  Defendants received almost no notice and did not have the opportunity to file opposition papers. At the

18  time of the hearing, no Defendant had been served with the Complaint. (Smith Decl., Exh. 3, pp. 173-

19  74). On November 20, 2013, the Court issued the TRO pending a hearing on an application for a

20  preliminary injunction. The TRO "return[ed] the parties to the pre-October 7, 2013 status quo as regards

21  the subject toll-free numbers, which specifically may include reactivating within 12 hours, the specific

22  toll-free numbers, attached to this Order with an XC designation as defined by the SMS/800 tariff, to

23  allow calls to these numbers to be received at Plaintiffs' call centers as before." (RJN, Exh. 14).

---

[4]    The Conversion claim was listed on the caption, but no cause of action was listed in the body of the Complaint.

10

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION
100151803v6

**B.**    **Upon Full Consideration Of The Applicable Facts And Law, The State Court Denied The Application For A Preliminary Injunction And Dissolved The Temporary Restraining Order.**

After the TRO hearing, Defendants filed an opposition brief demonstrating that Plaintiffs had not even plead a valid claim for breach of contract, much less provided evidence that a contract had been breached. Defendants submitted declaration from Ms. Kessler and DigitalMojo's former COO David Cadoff, who both testified, among other things, that DigitalMojo had materially breached the contract and owed USA Broadband at least $750,000 in past due commissions. (RJN, Exhs. 7-8). Ms. Kessler further testified that the parties always agreed that the contract could be terminated by either party at any time. (Id.)

Prior to the hearing, Plaintiffs filed a First Amended Complaint, changing the Breach of Contract claim to then contend that "As long as Plaintiffs continue to pay Defendants according to the Contract, Defendants will continue to route the SPNs to Plaintiffs." (RJN, Exh. 12, ¶ 35(i)). Plaintiffs also asserted a new claim for Conversion, contending that as a result of Defendants' actions, "Plaintiffs have been deprived of their rightful use of the SPNs . . ." (Id., ¶ 73).[5] Mr. Smith now asserts yet another new claim, that USA Broadband was a "broker or agent" with regards to the TFNs. (Smith Decl., ¶ 5).

In addition to the FAC, on December 11, 2013, two days before the hearing, Plaintiffs submitted an unauthorized reply brief and Supplemental Declaration of Martin Smith, notwithstanding that the Court's Order on the TRO explicitly provided that there would be no reply brief. (RJN, Exhs. 10-11). At the hearing, the judge stated that she had not read the new papers, and after argument, took the matter under submission in order to read the new papers and a supplemental brief that she authorized the Defendants to file. (RJN, Exh. 13).

On December 23, 2013, the Superior Court, Judge Joan M. Lewis, issued her ruling, holding in relevant part:

---

[5]    Accordingly, TeleServices' contention that "the Superior Court was not asked to determine property rights of the Debtor - - the State Court Action is purely a breach of contract matter" (Motion, p. 8, lines 25-26) is demonstrably false.

11

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION

100151803v6

Plaintiffs' motion for a preliminary injunction is denied because Plaintiffs have failed to demonstrate that they have a likelihood of success on the merits of this case. In this regard, the Court notes the absence of evidence demonstrating the duration of the purported contract and, to the extent Plaintiff [sic] contends the duration is greater than a year, that it would be barred by the statute of frauds. Additionally, Plaintiffs have an adequate remedy at law and therefore there is not a risk of irreparable harm. In making this latter finding, the Court finds the cases of *White v. Davis* (2003) 30 Cal.4[th] 528 and *Costa Mesa City Employees Association v. City of Costa Mesa* (2012) 209 Cal.App.4[th] 298 to be distinguishable.

(RJN, Exh. 14).

### C.    USA Broadband Directed Calls From The TFNs Away From DigitalMojo's Call Centers.

Defendants received a copy of the Court Order on the afternoon of December 23rd. Ms. Kessler was immediately notified, and thereafter immediately commenced steps to have USA Broadband cease directing calls from the TFNs to DigitalMojo's call centers. Because of the large number of TFNs (over 17,000), that process takes approximately 24 hours to re-direct all of the TFNs. Several hours later, at approximately 9:30 PM, she received notice from her attorneys that TeleServices had filed a petition for bankruptcy. (Kessler Decl., ¶ 24).

### D.    TeleServices Filed The Bankruptcy Petition And Then Filed The Emergency Motion.

After receipt of the Superior Court Order, TeleServices filed the Bankruptcy Petition. At approximately 5:26 P.M., counsel for TeleServices emailed a copy of the Petition to Defendants' litigation counsel Ryan Larsen, who was out of the office. The email was not sent to lead counsel Alan Croll. Mr. Larsen saw the email when he returned home at approximately 8:30, and forwarded it to Ms. Kessler later that evening. (Larsen Decl., ¶ 2).

TeleServices filed the petition for the express purpose of trying to gain control of the TFNs. On December 30, 2013, TeleServices filed the pending Motion, seeking an Order that 1) Kessler violated the automatic stay; 2) compelling Kessler to "turn over to the Debtor all access and control over inbound calls" for the TFNs; 3) if Kessler fails to comply within 24 hours, be ordered to pay $338,440 to Debtor; 4) prohibiting Kessler from taking actions to affect TeleServices' use of the TFNs; 5) compelling Kessler to "turn over all income or other rights obtained" from the TFNs; 6) compelling Kessler to pay $23,000

12

1  per day for violating the automatic stay; 7) ordering Kessler to pay TeleServices' legal fees in the

2  amount of $32,331.50; and 8) further relief the Court deems appropriate.

3      **E.**    **There Are Serious Questions As To Whether This Chapter 11 Case Is Proper.**

4          The Petition clearly appears to be in bad faith.  Only TeleServices - - not the other three state

5  court plaintiffs that claimed an interest in the TFNs - - filed for bankruptcy.  TeleServices contends that

6  it was making $23,000 per day from the TFNs, and lists less than $40,000 in claims from its creditors

7  (Smith Decl., ¶ 6, p. 131), yet it has still chosen to file for bankruptcy protection.  It appears to be

8  impossible for a company with that amount of supposed revenue to find itself in this position.

9  TeleServices contends in the Motion and in Mr. Smith's declaration (¶ 22) that it will be unable to meets

10  is monthly obligations under a lease, but <u>Mr. Smith confirmed in a sworn declaration in the state court</u>

11  <u>litigation that the lease was with DigitalMojo, not TeleServices.</u>  (RJN, Exh. 11, Exh. D).  The claimed

12  attorneys' fees for TeleServices' counsel in connection with the Motion are already approaching the

13  amount of creditors' claims.

14          While the Debtor's Schedules and Statement of Financial Affairs have yet to be filed, there are

15  serious questions as to whether the Debtor is insolvent at all.  While there appear to be minimal if any

16  claims by creditors, Mr. Smith states that "the Debtor also has numerous investors and those investors

17  will be owed money should the Debtor become insolvent and need to liquidate its assets." (Smith Decl.,

18  ¶ 22).  Unlike creditors, investors knew or should have known the risks associated with a business,

19  particularly one predicated on an oral agreement that was terminable at will.

20                    **IV.**    **ARGUMENT**

21      **A.**    **TeleServices Has No "Property" Right To Calls From The TFNs.**

22          **1.**    **Telephone Numbers Are Not Property Of A Bankruptcy Estate.**

23          The Ninth Circuit has expressly held that telephone numbers are not "property" that is part of a

24  bankruptcy estate.  <u>In In re Best re Manufacturing Co.</u>, 453 F. 2d 848 (9th Cir. 1971), the receiver for the

25  debtor requested that the Bankruptcy Court order the debtor's telephone provider to provide service to

26  the receiver under the debtor's old number.  <u>Id.</u> at 849.  The receiver argued that continuation of the

27  debtor's old telephone number was of vital importance to the debtor's business.  Id.  The telephone

13

28  MEMORANDUM  OF  POINTS  AND  AUTHORITIES  IN  OPPOSITION  TO  DEBTOR'S

EMERGENCY MOTION

1  provider, which was owed money by the debtor, refused, and argued that the Bankruptcy Court was

2  without jurisdiction to act because the dispute did not involve property of the debtor. Id. The

3  Bankruptcy Court agreed and the Ninth Circuit affirmed, holding that the Bankruptcy Court lacked

4  summary jurisdiction to protect possession of the debtor's telephone number because the existence of

5  any property right in a number was denied by the applicable regulations relating to phone numbers. Id.

6  at 849-50.

7       The Ninth Circuit is in accord with other jurisdictions. It is well-established that no party

8  "owns" or has a property interest in any toll-free number. Federal statute vests in the FCC exclusive

9  jurisdiction over telephone numbers, 47 U.S.C. § 251(e)(1), and the FCC repeatedly has held: "[T]oll

10  free numbers are a scarce public resource and are not the property of the individual entities to whom

11  they are assigned." U.S. Department of Health and Human Services Substance Abuse and Mental

12  Health Services Administration Petition for Permanent Reassignment of Three Toll Free Suicide

13  Prevention Hotline Numbers/Toll Free Service Access Codes, 27 FCC Rcd 2965, 2967 ¶ 5 (Wireline

14  Comp. Bur. 2012) (citing Toll Free Service Access Codes, Fourth Report and Order and Memorandum

15  Opinion and Order, 13 FCC Rcd 9058, 9061¶ 6 n.14 (1998); Toll Free Service Access Codes, Notice of

16  Proposed Rulemaking, 10 FCC Rcd 13692, 13702 ¶ 36 (1995); Administration of the North American

17  Numbering Plan, Report and Order, 11 FCC Rcd 2588, 2591¶ 4 (1995)) Accord Transaction Network

18  Services, Inc., TSYS Acquiring Solutions, LLS, & Electronic Payment Systems, LLC, 26 FCC Rcd

19  2109, 2111 ¶ 7 (Wireline Comp. Bur. 2011) ("The Commission has often stated that telephone numbers

20  are a public resource, and neither carriers nor subscribers 'own' their telephone numbers.").

21       Accordingly, numerous cases have reached the same conclusion. See Edge Grp., Inc. v.

22  Champion Mortgage Co., Inc., 519 F. 3d 150, 154 (3rd Cir. 2008) (relying on the Code of Federal

23  Regulations and cases decided by the Federal Communication Commission to conclude that phone

24  numbers are public resources that cannot be owned by subscribers or carriers); In re StarNet, Inc., 355 F.

25  3d 634, 637 (7th Cir. 2004) ("No one has a property interest in a phone number."); Slenderella Sys. of

26  Berkeley, Inc. v. Pac. Tel. & Tel. Co., 286 F. 2d 488, 490 (2nd Cir. 1961) (same)).

27

28  14

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
EMERGENCY MOTION
100151803v6

1    TeleServices simply has no property interest in the TFNs.  Accordingly, there was no violation

2    of the automatic stay by interfering with this non-existent property right.  The Motion must be denied for

3    this reason.

4    **2.    This Court Does Not Have Jurisdiction To Make A Ruling On The TFNs.**

5    While no entity "owns" TFNs, to the extent a question arises regarding who is the toll-free

6    subscriber of the TFNs, the FCC has exclusive jurisdiction to adjudicate such a dispute.  As noted above,

7    47 U.S.C. § 251(e)(1) gives the FCC "exclusive jurisdiction over those portions of the North American

8    Numbering Plan that pertain to the United States."  This exclusive jurisdiction includes all

9    determinations of who controls telephone numbers.

10    For example, in In re Transaction Network Services, Inc., TSYS Acquiring Solutions, LLC, &

11    Electronic Payment Systems, LLC, (WCB 2011) 26 F.C.C.R. 2109, 2111, the FCC specifically

12    concluded that the federal statutory grant of plenary jurisdiction in 47 U.S.C. section 251(e)(1)

13    precluded a court from ordering numbers be transferred to the winning party in a transactional dispute.

14    Id. at 2112 ¶ 9.  The FCC found "that several aspects of the arbitrator's ruling, and the District Court's

15    affirmation of that ruling, conflict with the ... provisions for assigning and transferring toll free

16    numbers.  The requirement that [defendants] transfer the seven toll free numbers . . . is contrary to

17    Commission rules," including in particular, "the assumption that a subscriber 'owns' its toll free

18    number."  Id.   See also Digital Communs. Network, Inc. v. AT&T Wireless Servs., 63 F. Supp. 2d

19    1194, 1202-03 (C.D. Cal. 1999)  (declining plaintiff's request for a preliminary injunction, referring case

20    to FCC, and holding "Courts should generally avoid expressing a view on the merits when referring a

21    case to an agency under the primary jurisdiction doctrine").

22    The "assigning and transferring" of the TFNs is exactly the relief TeleServices seeks herein.  The

23    Proposed Order requests, among other things, that "Kessler be ordered to return the Telephone Numbers

24    to Debtor by porting them to ATL Resp Org Service ("ATL") or at Debtor's election, to AUN51 . . ."

25    Respectfully, this Court does not have jurisdiction to issue any such order concerning the TFNs.

26    This position was explicitly expressed by TeleServices' FCC counsel prior to the filing of the

27    bankruptcy petition, until he then submitted a declaration contradicting himself.  On December 17, 2013,

15

28    MEMORANDUM   OF   POINTS   AND   AUTHORITIES   IN   OPPOSITION   TO   DEBTOR'S
EMERGENCY MOTION
100151803v6

1    Douglas Orvis, II, counsel for TeleServices, stated the following in a letter to Ms. Kessler's counsel:

2        [G]iven that the dispute that is the subject of this letter involves the application of the
         FCC rules and approved tariff, the FCC has primary jurisdiction over this dispute. *See In*
3        *re Transaction Network Services, Inc., TSYS Acquiring Solutions, LLC, and Electronic*
         *Payment Systems, LLC Regarding FCC Jurisdiction and RespOrg Responsibilities to*
4        *Comply with Part 52 of the FCC's Rules and the SMS/800 Tariff Requirements,* CC
         Docket No. 95-155, Declaratory Ruling, DA 11-355 at ¶ 7 (rel. Feb. 24, 2011).  . . . .
5        While state or federal court may be the proper venue to litigate breach of contract claims
         and to determine the appropriate equitable relief pending resolution of the suit, the FCC
6        alone enforces its numbering rules. **As the FCC, and the FCC alone, can determine**
         **the proper disposition of the toll-free numbers in question**, we believe that seeking an
7        FCC determination regarding the numbers is appropriate.

8    (Declaration of David Solomon, ¶ 5, Exh. "A") (emphasis added).

9        However, in his declaration in support of the Emergency Motion, Mr. Orvis retreats from the

10   aforementioned admission regarding the FCC's exclusive jurisdiction and instead asserts that the United

11   States District Court also has jurisdiction.  (Declaration of Douglas Orvis, II, ¶ 6.)  Mr. Orvis' legal

12   conclusion is not evidence before the Court in any event, but at the very least, the Court should

13   recognize this blatant contradiction.

14       This Court has no jurisdiction to adjudicate a request for the transfer of TFNs.  TeleServices'

15   current contention to the contrary is incorrect and unsupported by any authority.

16                  **3.      Even If The Court Had Jurisdiction To Make Such A Ruling, USA**

17                  **Broadband, Not TeleServices, Is The Toll-Free Subscriber To The TFNs.**

18       Even if TFNs did constitute "property" of the estate, and this Court had jurisdiction to issue such

19   a ruling, neither of which is true, TeleServices' claim would fail on the merits for numerous reasons.

20       Out of 256 pages of total paper filed in connection with the Motion, TeleServices has buried in

21   one paragraph of a declaration by its own attorney that TeleServices is the "subscriber of record" (an

22   undefined term) with respect to the TFNs, and thus apparently has some sort of right to the TFNs.

23   (Orvis Decl., ¶ 5).  TeleServices fails to establish that Mr. Orvis is an expert, fails to attach or make

24   available the papers Mr. Orvis supposedly relied upon in reaching his conclusion, and fails to cite with

25   specificity the legal basis for his opinion.  Instead, Mr. Orvis offers this conclusion based upon his

26   review of some unspecified "correspondence" between TeleServices and the Kessler Affiliates.  Such

27   testimony fails to meet the Debtor's burden on this issue.  Mr. Orvis' conclusions have been disputed by

16

28   MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
     EMERGENCY MOTION

1  David Solomon, the former Chief of the FCC's Enforcement Bureau, who has also held the position of

2  FCC Deputy General Counsel and FCC Assistant General Counsel for Administrative Law.  (Solomon

3  Decl., ¶ 6, Exh. "B").

4        TeleServices has failed to address any of the relevant factors.  First, under the FCC's rules the

5  "toll-free subscriber" is defined as the "entity that requests a Responsible Organization to reserve a toll

6  free number from the SMS database."  (47 CFR § 52.101(e)).  For each TFN at issue, one of the

7  defendant RespOrg was the RespOrg and neither TeleServices nor DigitalMojo or any state court

8  plaintiff ever paid the RespOrg charges.  (Dye Decl., ¶¶ 2-5.)  In fact, over 9,000 of the subject TFNs

9  were reserved from the SMS/800 spare pool by the defendant RespOrgs and were in use well prior to the

10  arrangement with Mr. Smith that began in 2006.  (Kessler Decl., ¶ 13).  TeleServices is not a RespOrg

11  and never had control over the numbers.  Only USA Broadband meets the definition of "toll free

12  subscriber" for the subject TFNs under the FCC rules.

13        TeleServices' apparent contention that its payment of the telephone carrier charges to transport

14  the call traffic to their call centers constituted payment of the "toll-free subscription costs" and thus

15  made TeleServices the "customer of record" for the TFNs is meritless.[6]  DigitalMojo actually deducted

16  the carrier charges from the commissions it paid to USA Broadband, leaving financial responsibility

17  with USA Broadband.

18        In any event, payment of carrier charges does not define the toll-free subscriber for TFNs.  As

19  discussed above, the FCC's rules define the toll-free subscriber as the entity with the relationship with

20  the RespOrg that reserves the number from the toll-free database, and that entity is USA Broadband.

21  TeleServices' argument appears to be based on the suggestion in 47 CFR section 52.105 that a toll-free

22  subscriber is the entity willing to be "billed for toll-free service associated with the number."  This

23  phrase cannot mean, however, that the subscriber must be purchasing transport from the RespOrg

24  because there is no requirement that RespOrgs be telephone carriers, and many RespOrgs are not

25  telephone carriers.  See, e.g., Toll Free Service Access Codes; Database Services Management, Inc.

26  _____
   [6]      The term "customer of record" is not defined in the FCC's rules or cases and has no apparent
27  significance herein.

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION

17

100151803v6

1 Petition for Declaratory Ruling, (2000) 15 FC.C.R. 11939, 11941 ¶ 3 ("RespOrgs are carrier and non-

2 common carrier entities that are certified by DSMI to access and use information in the centralized

3 SMS/800 database"); see also 47 CFR § 52.101(b) (defining "RespOrg" without reference to carrier

4 status). As a result, whenever a customer uses a non-carrier RespOrg to reserve a TFN, the customer

5 must arrange for a carrier to transport the traffic to its designated location. Accordingly, this

6 arrangement is not the one described in Section 52.105.

7      Second, Mr. Smith continually acknowledged to Ms. Kessler that USA Broadband was the toll-

8 free subscriber of the TFNs. Likewise, Mr. Cadoff has confirmed that both he and Mr. Smith always

9 knew that USA Broadband was the toll-free subscriber. Mr. Smith authored emails to Dish Network

10 confirming that he did not own or control the TFNs, and in discussions about selling his company to a

11 third party, disclosed that he did not control the TFNs.

12      None of this is surprising or controversial; if DigitalMojo or any other state court plaintiff such

13 as TeleServices were actually the toll-free subscriber, it never would have continued to pay millions of

14 dollars for years to USA Broadband in exchange for directing calls from the TFNs. If DigitalMojo were

15 the toll-free subscriber, it could have done so itself.[7]

16     **B.**   **TeleServices Has No Contractual Right To Calls From The TFNs.**

17        **1.**     **The Contract Was With DigitalMojo, Not TeleServices.**

18      At the outset, USA Broadband never had any contract with TeleServices. Mr. Smith and Ms.

19 Kessler agreed that the contract was between USA Broadband and GoBroadband, which later changed

20 its name to DigitalMojo. USA Broadband never agreed to any contract with TeleServices. (Kessler

21 Decl., ¶ 8).

22      TeleServices provides no evidence to the contrary. There is no adversary complaint on file

23 alleging any such contract, and in fact,  the state court litigation is being prosecuted by other entities that

24

25   [7]     TeleServices clearly recognizes this inconsistency. In the initial complaint, Plaintiffs at times

26 contended that they have the rights of a toll-free subscriber of the TFNs (RJN, Exh. 1, ¶ 28); at others, they acknowledge USA Broadband was the toll-free subscriber and were routing the numbers to

27 Plaintiffs' call centers (Id, ¶¶ 19-20). The latter contention is correct.

18

28 MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
EMERGENCY MOTION

100151803v6

1  contend that they have the contractual right to the TFNs.  Mr. Smith's declaration merely states that "I

2  entered into an agreement ("Contract") with Sandra Kessler ("Kessler") . . ." (Smith Decl., ¶ 5).  Mr.

3  Smith is not the debtor and DigitalMojo is not the debtor.  The Motion must be denied for this reason

4  alone.

5          **2.     The Contract Was Terminated Months Before The Bankruptcy Petition.**

6          The contract between USA Broadband and DigitalMojo was terminated on approximately

7  October 6, 2013.  USA Broadband's right to terminate was later temporarily enjoined during the

8  pendency of the TRO, but the TRO was dissolved prior to the Bankruptcy Petition.  Accordingly, at the

9  time of the Petition, none of the state court plaintiffs, much less TeleServices, had any contractual right

10  to receive calls from the TFNs.

11          This creates an insurmountable hurdle for TeleServices, because he law is clear that a bankruptcy

12  petition does not revive contractual rights that have already lapsed or been terminated.  In re Edwin M.

13  Lipscomb Farms, Inc. v. Michigan Millers Mutual Ins. Co., 90 B.R. 422 (W.D. Missouri) (1988); In re

14  Heaven Sent Ltd. v. Commercial Union Ins. Co., 37 B.R. 597 (E.D. Penn.) (1984); Moody v. Amoco Oil

15  Co., 734 F. 2d 1200, 1212 (7th Cir. 1984) ("If a contract has been terminated pre-bankruptcy, there is

16  nothing left for the debtor to assume.").

17          Accordingly, it did not matter whether TeleServices filed the Petition one second, one minute, or

18  one hour, after the TRO was dissolved.  The instant it was dissolved, any "right" TeleServices had to the

19  TFNs evaporated.  When the Petition was filed, there was nothing left to preserve.

20          For example, in In re Edwin M. Lipscomb Farms, Inc., a Chapter 11 debtor that had been

21  engaged in the business of warehousing, storing and trading in grain and agricultural products filed an

22  adversary action and sought an injunction against the issuer of its "grain dealer's bond" and "grain

23  warehouseman's bond." 90 B.R. at 423.  The Bankruptcy Court, held, however, that the debtor was not

24  entitled to an injunction requiring the issuer to keep the bonds in place because the issuer had sent 90–

25  day notices of cancellation to the debtor before the bankruptcy filing.  Id. at 424.  Citing numerous cases

26  from numerous jurisdictions, the court explained: "The rule . . . is that if the agreement is cancellable by

27  the terms contained therein and one of the parties properly initiates such cancellation pre-petition and

19

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
EMERGENCY MOTION

100151803v6

1   nothing more remains to be done except wait for the passage of time, the mere filing of a petition for

2   relief neither halts nor stays the cancellation." Id. (citing Moody v. Amoco Oil Co., supra; In re

3   Lauderdale Motorcar Corp., 35 B.R. 544 (S.D. Fla. 1983); In re New Media Irjax, Inc., 19 B.R. 199

4   (M.D. Fla. 1982); In re Hospitality Associates, Inc., 6 B.R. 778 (D. Oregon 1980)).

5          Similarly, in In re Heaven Sent Ltd. v. Commercial Union Ins. Co., the debtor filed a complaint

6   and motion seeking an order directing its automobile and workers' compensation insurer to renew the

7   policies. 37 B.R. 597. The debtor argued that unless the Bankruptcy Court exercised its equitable

8   power to force the insurer to renew the insurance policies, it (the debtor) would be unable to acquire

9   replacement coverage, the "inevitable result" of which will be the cessation of the debtor's business and

10  a liquidation of its assets. Id. at 598. The court rejected the debtor's arguments and denied the motion,

11  explaining:

12         "The [Bankruptcy] Code does not, however, grant the debtor in bankruptcy greater rights
           and powers under the contract than he had outside of bankruptcy. The court finds nothing
13         in the Code which enlarges the rights of [the debtor] under the contract or which prevents
           the termination of the contract on its own terms on [the expiration date]."
14

15  Id. (quoting White Motor Corp. v. Nashville White Truck, Inc., 5 B.R. 112, 117 (M.D. Tenn.1980).

16         The same result is warranted here. The contract was terminated months before the bankruptcy

17  petition was filed. The temporary legal fiction that the contract was still in place expired immediately

18  upon the issuance of the Order dissolving the TRO. The bankruptcy petition did not renew these rights,

19  and accordingly, there could be no violation of the automatic stay.

20         **3.     Even If The Contract Was With TeleServices And Had Not Already Been**

21              **Terminated, The Contract Claim Fails For Numerous Reasons.**

22              *a.     TeleServices Does Not Even Allege A Claim For Breach Of Contract,*

23                 *Much Less Provide Evidence In Support Of Such Allegations.*

24         To state a claim for breach of contract, a party is required to 1) attach the contract to the

25  complaint (or allege its essential terms verbatim); 2) allege plaintiffs' performance or excuse for

26  nonperformance; and 3) allege the specific terms breached and the facts constituting the breach. Lortz v.

27  Connell, 273 Cal. App. 2d 286, 290 (1969). TeleServices' claim fails at the outset because it does not

                                         20

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
    EMERGENCY MOTION

1 | allege a necessary, specific material term - - the duration of the contract and/or how the contract could

2 | be terminated.  Accordingly, it cannot allege that USA Broadband breached any such non-existent term.

3 | TeleServices has not even pled a valid contract claim, much less established the likelihood of prevailing

4 | on such a claim.  The Motion must be denied on this basis alone.

5 | <center>**b.    *The Contract Was Terminable At Will.***</center>

6 | In contrast to TeleServices' deliberate silence as to the purported term of the contract, Ms.

7 | Kessler has unequivocally stated that the parties always agreed that the contract could be terminated by

8 | either party at any time.  This was acknowledged by Mr. Smith on multiple occasions, and in fact, he

9 | himself stated at times that he was going to shut down his business.  It is also supported by the parties'

10 | conduct, because USA Broadband stopped directing calls from numerous TFNs to DigitalMojo, without

11 | any objection.  The parties' relationship was not exclusive; in fact, Mr. Smith claims that 30% of the

12 | calls came from sources other than USA Broadband.  (Smith Decl., ¶ 13).  It defies logic that the parties

13 | would have agreed to a contract that could never be terminated.  Accordingly, USA Broadband did not

14 | breach any term of any contract by choosing to end the business arrangement several months ago.

15 | The result would be the same even if the parties had not expressly agreed that the contract was

16 | terminable at will.  "The rule is well established in California . . . [that] as to contracts contemplating

17 | continuing performance for an indefinite time, the general rule is that such contracts <u>are terminable at</u>

18 | <u>will by either party</u>."  <u>Zimco Rests., Inc. v. Bartenders & Culinary Workers Union, Local 340</u>, 165 Cal.

19 | App. 2d 235, 240 (1958) (emphasis added); <u>see also</u> <u>Aspex Eyewear, Inc. v. Vision Serv. Plan</u> (9th Cir.

20 | 2010) 389 Fed.Appx. 664, 665 ("the record contains no facts demonstrating that [defendant] committed

21 | itself to continue in its relationship with [plaintiff] for any definite duration.  The agreement between

22 | [plaintiff] and [defendant] appears to be one of indefinite duration, making it terminable at will of either

23 | party."; denying application for preliminary injunction); <u>Zee Medical Distrib. Ass'n v. Zee Medical</u>, 80

24 | Cal. App. 4th 1, 10 (2000) ("If neither an express nor an implied term can be found, the court will

25 | generally construe the contract as terminable at will.").

26 |

27 |

<center>21</center>

28 | MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S
EMERGENCY MOTION

100151803v6

   c.  ***An Oral Agreement Requiring USA Broadband To Direct Calls To Any Plaintiff For More Than A Year Would Violate The Statute Of Frauds And Be Unenforceable.***

  California Civil Code section 1624(a)(1) provides that an oral contract is invalid where the "agreement . . . by its terms is not to be performed within a year from the making thereof." To the extent that TeleServices contends that USA Broadband breached an oral contract by terminating it in violation of the agreement, after 7 years, it necessarily contends that the parties intended the contract to last more than 7 years. Such a contract would violate the statute of frauds and be unenforceable.

   d.  ***Even If The Agreement Was Not Terminable At Will, USA Broadband Had The Right To Terminate Because DigitalMojo Breached By Failing To Make The Agreed-Upon Payments.***

  Even if the agreement was not terminable at the will of either party, the claim for breach of contract and resulting purported property right subject to the automatic stay would still fail. Neither TeleServices nor any other plaintiff can seek any affirmative relief because it materially breached by failing to make the agreed-upon payments, and in fact, owes USA Broadband approximately $2,000,000. This is attested to not only by Ms. Kessler, but DigitalMojo's own former COO David Cadoff. Moreover, Mr. Smith cannot equivocally dispute it, instead he has claimed: "In fact, to this day I am uncertain how much Kessler is owed, if anything, for that time period. We are performing an accounting in an effort to determine that . . . it is somewhat difficult to determine a precise amount of net revenue attributable to the subject toll-free numbers for any specific period of time." (RJN, Exh. 11, Supp. Smith Decl., ¶ 8(e)).

  "It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance." Consolidated World Investments, Inc. v. Lido Preferred Ltd., 9 Cal. App. 4th 373, 380 (1992). Thus, "[o]ne who himself breaches a contract cannot recover for a subsequent breach by the other party." Silver v. Bank of America, N.T. & S.A., 47 Cal. App. 2d 639, 645 (1941). The failure to continue with performing under a contract that was validly terminated months ago cannot constitute a violation of the automatic stay.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION

100151803v6

### C.    The Motion Should Be Also Denied Because It Is Procedurally Improper As The Relief Requested Must Be Sought In An Adversary Proceeding.

TeleServices essentially admits that the Motion is procedurally deficient and improper. TeleServices states that it "plans" to seek declaratory relief in an adversary proceeding, and will do so "imminently." (Motion, p. 12, lines 11-12). TeleServices claims that "The Court Should Defer Rendering A Dispositive Ruling On The Debtor's Claim To The Telephone Numbers Until The Matter Is Properly Before It As An Adversary Proceeding." (Motion, p. 12, lines 3-5). So far, so good. However, at the same time, TeleServices also contends that the Court should award it the extraordinary relief it seeks before that final determination in an adversary proceeding. This is exactly backwards.

Among the scattershot of relief TeleServices seeks in the motion is to recover money, to determine an interest in property, an injunction mandating affirmative conduct by USA Broadband, and a declaratory judgment. Each one of these purported remedies require an adversary proceeding. Fed. R. Bankr. P. 7001(1), (2), (7), and (9). This Court may not entertain such relief without an adversary proceeding. In re Commercial Western Finance Corp., 761 F. 2d 1329, 1336-38 (9th Cir. 1985); see also In re Brawders, 503 F. 3d 856, 870 (9th Cir. 2007) (stating that adversary proceeding is "required" for, among other things, determining an interest in property or a declaratory judgment of same); In re Jahr, No. 11-02302, 2012 WL 3205417, at *4 (B.A.P. 9th Cir. 2012) ("And it is settled law in this circuit that it is error for a bankruptcy court to determine property interests outside of an adversary proceeding.")

Accordingly, until an adversary proceeding has been filed and litigated to a final determination on the merits, the Court simply cannot consider the Motion. "Where Rule 7001 'require[s] an adversary proceeding – which entails a fundamentally different, and heightened, level of procedural protections – to resolve a particular issue, a creditor has the due process right not to have that issue resolved without one.'" In re Semcrude, L.P., 728 F. 3d 314, 322 (3rd Cir. 2013) (quoting In re Mansaray-Ruffin, 530 F. 3d 230, 242 (3rd Cir. 2008)).

The failure to follow correct procedures has prejudiced the Kessler Affiliates. In an adversary complaint, TeleServices would be required to plead actual claims with specificity against each actual

23

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION
100151803v6

1    party.  In the adversary proceeding, TeleServices would be required to produce evidence to substantiate

2    those claims.  TeleServices' assertion that this Court can nonetheless rule on the Motion is

3    unsubstantiated, erroneous, and inconsistent with the law in and out of this Circuit.[8]  While the Motion

4    fails on the merits, it should also denied for this separate and independent reason.

5          Finally, the Court should sanction the Debtor for proceeding with an unnecessary and

6    unwarranted Emergency Motion.  There are many additional inconsistencies, arguments, and issues that

7    would be raised by the Kessler Affiliates but for the press of time necessitated by the emergency nature

8    of the relief sought, on shortened time, over the holidays.  At the end of the day, the purported

9    "emergency" is nearly identical to the "emergency" already decided in state court, which had already

10   considered and rejected arguments regarding irreparable harm.  There was no reason for the Debtor to

11   seek relief on shortened time as it did.  The Kessler Affiliates therefore respectfully request that the

12   Court sanction Debtor in an amount equal to the attorneys' fees incurred in preparing this Opposition

13   pursuant to Local Bankruptcy Rule 9014-5(f) for presenting the Court with an unnecessary emergency

14   motion.  The Kessler Affiliates reserve the right to file a separate application detailing the amount of

15   such fees.

16

17

18

19

20   / / /

21   / / /

22   / / /

23   _____
     [8]     The only "authority" cited in in support of this assertion is a reference to a matter entitled "*In re*
24   *Vivid Image Technology*" that TeleServices' counsel apparently worked on.  TeleServices states that no
     memorandum of decision or order is available because of "sensitive information" contained in the order.
25   (Motion, p. 12, fn. 1).  Nor does TeleServices allege that the matter had anything to do with an
     emergency motion or a preliminary finding giving the debtor the right to disputed property pending a
26   final ruling; much less monetary damages, contempt, and attorneys' fees as sought herein.  It is no basis
     whatsoever for the extraordinary relief sought in the Motion.
27
                                                        24
28   MEMORANDUM   OF   POINTS   AND   AUTHORITIES   IN   OPPOSITION   TO   DEBTOR'S
     EMERGENCY MOTION
     100151803v6

# V.    CONCLUSION

This Motion is nothing more than a bad faith and meritless attempt to collaterally attack an application for a preliminary injunction that has already been denied.  For each and all of the foregoing reasons, Defendants respectfully request that the Court deny the Motion.

Dated:  January 3, 2014

**KATTEN MUCHIN ROSENMAN LLP**

By:_____
       Ryan J. Larsen

**SHEPPARD MULLIN RICHTER HAMPTON LLP**

By:_____/s/_____
       J. Barrett Marrum

Attorneys for Sandra Kessler, PrimeTel
Communications, Inc., Unilink Telcom, Inc.,
WireStar Communications, Inc., Mayfair
Communications, Inc., USA Broadband, Inc. and
Yorkshire TeleCom, Inc.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEBTOR'S EMERGENCY MOTION
100151803v6